Clifford J. SCHEINER Plaintiff,

v.

NEW YORK CITY HEALTH AND HOSPITALS, et al., Defendants.

No. 98 CIV. 8330(JGK).

United States District Court, S.D. New York.

July 24, 2001.

Eugene Nathanson, New York City, for Plaintiff.

Kevin J. Smith, ACC, New York City, for Defendants.

## OPINION AND ORDER

KOELTL, District Judge.

This action is brought pursuant to 42 U.S.C. § 1983 and also invokes the Court's supplemental jurisdiction over pendent state law claims. The plaintiff, Clifford J. Scheiner ("Scheiner"), alleges that he was stripped of his clinical privileges and fired from his position as an emergency room physician at Kings County Hospital Center in violation of his rights under the First and Fourteenth Amendments to the United States Constitution. The plaintiff also brings state law claims for malicious prosecution and for a violation of New York State's whistleblower statute, N.Y. Civ.

Serv. Law § 75–b.[1] The defendants, the New York City Health and Hospitals Corporation ("HHC"), Reinaldo Austin ("Dr.Austin"), Theodore Bania ("Dr.Bania"), Bonny Baron ("Dr.Baron"), Gene Becker ("Dr.Becker"), Randall Bloomfield ("Dr.Bloomfield"), Audrey Phillips–Caesar ("Phillips–Caesar"), Louis Camilien ("Dr.Camilien"), Devitt Elverson ("Dr.Elverson"), James Fine ("Dr.Fine"), Edward Fishkin ("Fishkin"), Ronald Hartnet ("Dr.Hartnet"), Charles Hyman ("Dr.Hyman"), Jean G. Leon ("Leon"), Ronald B. Low ("Dr.Low"), Luis R. Marcos ("Dr.Marcos"), Richard Meehan ("Dr.Meehan"), Pedro Penha ("Dr.Penha"), Venkatesalu Rajagopal ("Dr.Rajagopal"), James Reilly ("Dr.Reilly"), Philip Rice ("Dr.Rice"), Martin Salwen ("Dr.Salwen"), Thomas Scalea ("Dr.Scalea"), Steven Seligman ("Dr.Seligman"), Constance Shames ("Dr.Shames"), Richard Sinet ("Dr.Sinet"), Ian Shivack ("Dr.Shivack") and Arnold Strashun ("Dr.Strashun") now move for summary judgment pursuant to Fed.R.Civ.P. 56. The plaintiff has cross-moved for partial summary judgment against Dr. Elverson, Dr. Strashun, Dr. Bloomfield, Dr. Hyman, Dr. Seligman, Dr. Philips–Caesar, Dr. Leon, Dr. Marcos, and HHC (collectively the "Responding Defendants").

### I.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.

R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Gallo v. Prudential Residential Servs. Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir.1994). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); see also Gallo, 22 F.3d at 1223. If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.

1. This Court has previously denied a motion to dismiss in this case brought by certain of the defendants. See Scheiner v. New York City Health and Hosp. Corp., No. 98 Civ. 8330, 1999 WL 771383 (S.D.N.Y. Sept. 28, 1999).

The plaintiff, however, conceded that certain other state law claims alleged in the Complaint were barred by the statute of limitations. See Scheiner, 1999 WL 771383, at *13.

56(e). With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

## II.

The following facts are not in dispute, except where noted. Kings County Hospital Center ("KCHC") is a municipal hospital and is a facility of the defendant HHC, a public corporation chartered by the State of New York. (Compl. ¶ 9; Pl.'s 56.1 St. ¶ 2; Defs.' 56.1 Counter–St. ¶ 1.) The plaintiff began employment at KCHC in 1976, first as an intern and ultimately as an attending physician. (Pl.'s 56.1 St. ¶ 1; Defs.' 56.1 St. ¶¶ 1–4; Pl.'s 56.1 Counter–St. ¶¶ 1–3.) The plaintiff worked in the Department of Emergency Medicine ("DEM") and the Urgent Care Center ("UCC") until December 5, 1995, when his clinical privileges were revoked. (Defs.' 56.1 St. ¶ 6; Pl.'s 56.1 St. ¶ 3.) The plaintiff's employment was terminated on or about March 6, 1996. (Defs.' 56.1 St. ¶ 7; Pl.'s 56. St. ¶ 4; Defs.' 56.1 Counter–St. ¶ 3.)

In the summer of 1994, defendant Phillips–Caesar became Deputy Executive Director of KCHC with supervision over various areas of hospital administration. (Defs.' 56.1 St. ¶ 8; Pl.'s 56.1 Counter St. ¶ 4.) Defendant Jean Leon began her employment at KCHC in or about July 1994 as the Interim Executive Director, and became the Executive Director in or about February 1995. (Defs.' 56.1 St. ¶ 9.) Defendant Dr. Rice, who was asked to join the staff of KCHC by defendant Dr. Scalea, began his employment at KCHC in or about July 1992 as the Director of the DEM. (Defs.' 56.1 St. ¶ 10.)

In April 1994, Dr. Rice initiated disciplinary proceedings against Scheiner by initiating a Request for Disciplinary Action ("RDA") against the plaintiff with the Chairman of the Medical Staff Committee. (Defs.' 56.1 St. ¶ 29; Third Declaration of Assistant Corporation Council Kevin J. Smith dated October 30, 2000 (hereinafter "Joint Ex."), Joint Ex. 2.) The RDA contained four allegations against the plaintiff: lack of basic medical knowledge; repeated displays of rudeness; refusal to or delay in evaluating or treating patients in violation of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"); and, insubordination. (Joint Ex. 2 at 1.) Pursuant to the KCHC Medical Staff By-laws (Joint Ex. 1 at 33–34), the RDA was referred to an Ad Hoc Committee of the DEM ("AHC"). (Defs.' 56.1 St. ¶ 30.) The Ad Hoc Committee consisted of Drs. Low, Baron, Hartnet, and Bania. (Joint Ex. 3; Defs.' 56.1 St. ¶ 44.) Under the KCHC Medical Staff By-laws, the AHC investigates the matter and makes a report on the matter to the Medical Staff Committee ("MSC"). The KCHC Medical Staff By-laws provide that the AHC is to interview the practitioner subject to discipline, but the interview does not constitute a hearing. (Joint Ex. 1 at 33–34.)

On or about April 27, 1994, Dr. Low, a physician and faculty member within the DEM, sent the plaintiff a letter which: (1) informed the plaintiff that he was the Chairman of the AHC; (2) informed the plaintiff of the general nature of the statements made about him that were included within the RDA; (3) provided to the plaintiff a list of the medical cases that were the subject of the RDA, a statement about the complaints of rudeness regarding the plaintiff, a statement of the alleged COBRA violations, and a statement regarding the plaintiff's insubordination. (Joint Ex. 3.)

On or about April 30, 1994, the plaintiff requested that he have the opportunity to review the medical records of the patient cases that were the subject of the RDA. (Defs.' 56.1 St. ¶ 41.) The plaintiff was given the opportunity to review the medical charts of the patient cases over a period of 1 to 1½ hours. (Defs.' 56.1 St. ¶¶ 42–43.) On May 3, 1994, the AHC met with the plaintiff. (Defs.' 56.1 St. ¶ 44; Pls. 56.1 Counter–St. ¶ 20.) The AHC, pursuant to Article 9 of the KCHC Medical Staff By-laws, then recommended to the MSC that the plaintiff be dismissed from the KCHC Medical Staff. (Joint Ex. 1, at 34; Joint Ex. 4 at 5.)

Pursuant to the KCHC Medical Staff By-laws, the MSC is to consider the AHC report and conduct its own investigation and take whatever action it deems appropriate under the circumstances. (Joint Ex. 1 at 34–35.) The MSC that investigated the plaintiff consisted of Drs. Meehan, Camilien, Rajagopal, Reilly, Salwen, and Shames. (Defs.' 56.1 St. ¶ 53.) The MSC convened on June 3, 1994, and met with the plaintiff regarding the RDA. (Joint Ex. 5.) The MSC recommended that the President of the Medical Staff inform defendant Leon that, due to Scheiner's unsatisfactory performance, he should be dismissed. (Joint Ex. 5 at 14.) By letter dated Sept. 29, 1994, Dr. Meehan informed Leon of the MSC's recommendation regarding the plaintiff. (Joint Ex. 6.)

Subsequently, by letter dated October 11, 1994, Leon informed the plaintiff that, based upon the recommendations of the AHC and the MSC, it was proposed that the plaintiff's clinical privileges and staff membership at KCHC be revoked, and that he not be reappointed to the medical staff at KCHC. (Joint Ex. 7.) Leon also advised the plaintiff of his right to invoke the grievance procedure pursuant to Article 10 of the KCHC Medical Staff By-laws, and set forth the grievance procedures to which the plaintiff was entitled. (Joint Ex. 7.) The letter also allegedly included a copy of the RDA. (Joint Ex. 7; Joint Ex. 11; Pl.'s 56.1 Counter–St. ¶ 22.)

Thereafter, in a November 4, 1994 letter to Dr. Meehan, the President of the Medical Staff, the plaintiff initiated the grievance procedure set forth in the KCHC Medical Staff By-laws. (Joint Ex. 11.) By letter dated December 30, 1994, Dr. Elverson informed the plaintiff that the formal grievance procedure had been commenced and that the Initial Hearing Panel ("IHP"), Step 4 of the Article 10 grievance procedures, would meet to review the matter. (Joint Ex. 18.) Under the KCHC Medical Staff By-laws, the IHP is charged with "conduct[ing] a thorough and impartial investigation of the grievance," including interviewing persons believed to have information and reviewing pertinent documents. (Joint Ex. 1 at 42.) The IHP, composed of Dr. Elverson, as Chairman, and Drs. Strashun and Wetzel, convened on January 18, 1995, January 19, 1995, and March 7, 1995. (Joint Ex. 21, Transcript dated January 18, 1995, and January 19, 1995 ("Jan.Tr.") at 1–2, 108–109; Joint Ex. 21, Transcript dated March 7, 1995 ("Mar. Tr.") at 1–2.) Prior to the start of the IHP proceedings, the plaintiffs submitted to the IHP members a written rebuttal to the RDA, which was entered as an exhibit during the IHP proceedings. (Pl.'s Ex. 1; Joint Ex. 21, Jan. Tr. at 3.) The plaintiff, Dr. Rice, Dr. Scalea and Dr. Austin testified during the IHP proceedings with respect to the allegations contained in the RDA. (Joint Ex. 21.)

On March 14, 1995, the IHP found that the plaintiff was medically incompetent. (Joint Ex. 22.) The plaintiff appealed the IHP's finding to the Appeal Board ("AB"). (Joint Ex. 24.) The AB panel that reviewed the plaintiff's grievance consisted

of Dr. Bloomfield, Dr. Hyman, Dr. Fine and Dr. Seligman. (Joint Ex. 27, Transcript dated May 15, 1995 ("May Tr."), at 1.) Pursuant to the KCHC Medical Staff By-laws, in reaching its decision, the AB is directed to review the transcripts and the final report of the IHP and may interview any person who appeared before the IHP and review documents submitted to the IHP. (Joint Ex. 1 at 44.) The AB, however, "may not interview other persons, consider additional written material or extend the scope of the investigation to matters not considered by the [IHP]" unless there is a compelling reason to do so. (Joint Ex. 1 at 44.) On July 14, 1999, after two meetings in which evidence was presented (Joint Ex. 27), the AB rejected the plaintiff's appeal, finding that there was substantive and compelling evidence to support the IHP's decision. (Joint Ex. 29.)

The plaintiff requested review by defendant Marcos, the President of HHC. (Joint Exs. 31 & 32.) As part of the plaintiff's notification to appeal to the President of HHC, the plaintiff requested an opportunity to have a personal interview with Dr. Marcos. (Joint Ex. 32.) Although the President denied the plaintiff's request to have a personal interview (Joint Ex. 33), the plaintiff was permitted to submit a written statement setting forth why the plaintiff believed that the decision to revoke his clinical privileges was erroneous. (First and Second Declarations of Assistant Corporation Council Kevin J. Smith dated September 5, 2000 (hereinafter "Defs.' Ex."), Defs.' Ex. N.) Dr. Marcos denied the plaintiff's appeal by letter dated November 13, 1995. (Joint Ex. 34.)

Shortly thereafter, on or about December 6, 1995, the plaintiff's staff and clinical privileges at KCHC were revoked and the plaintiff was informed that he would not be reappointed to the medical staff at KCHC. (Joint Ex. 36 at 5.) On or about January 24, 1996, Doctors Council, the collective bargaining agent for the plaintiff and other physicians at KCHC, filed a Step II grievance under the collective bargaining agreement in place between the City of New York and Doctors Council, claiming that the plaintiff's termination violated the collective bargaining agreement. (Defs.' Ex. P.) On March 1, 1996, the Step II review officer for HHC denied the plaintiff's Step II grievance. (Defs.' Ex. Q.) On or about March 6, 1996, the defendant Leon terminated the plaintiff. (Def.Ex. R.)

In June 1996, the plaintiff appealed the revocation of his privileges to the New York State Department of Health Public Health Council ("Public Health Council"), claiming that KCHC acted improperly in terminating his privileges. (Joint Ex. A.) On December 2, 1996, the Public Health Council rejected Scheiner's appeal, finding that KCHC had not been arbitrary or capricious in terminating the plaintiff and had not acted in bad faith or in violation of its by-laws. (Joint Ex. C.)

Also in June 1996, the plaintiff, through the Doctors Council, requested arbitration for the alleged violation of "the applicable Doctors Council collective bargaining agreement by the improper discipline and/or termination" of the plaintiff's employment. (Defs.' Ex. S.) On July 17, 1998, the arbitrator issued a decision finding that the actions of KCHC Medical Board were "not procedurally regular" under the collective bargaining agreement and its own rules and regulations. (Joint Ex. D at 56.) The arbitrator reinstated the plaintiff's clinical privileges and employment at KCHC with full back pay effective May 8, 1996, and remanded the plaintiff's status to the medical staff review procedures for a new imposition under the KCHC Medical Staff By-laws. (Joint Ex. D at 56.) HHC filed a petition to vacate the arbitration award with the New York

State Supreme Court, New York County, which was denied on July 30, 1999. *See New York City Health and Hospital's Corporation v. Doctors Council,* Index No. 403795/98 (N.Y.Sup.Ct. Jul. 30, 1999), *modified,* Index No. 403795/98 (N.Y.Sup.Ct. Jan. 6, 2000) (attached to Letter from Kevin J. Smith dated July 3, 2001).[2]

The same charges of medical incompetence that were the subject of the KCHC disciplinary proceedings which ended in the termination of the plaintiff's medical privileges were at some point referred to the New York State Department of Health's Office of Professional Medical Conduct by Dr. Rice. (Pl.'s Exs. 14 & 15.) The Office of Professional Medical Conduct investigated the allegations and concluded that, although there were indications that the plaintiff had difficulties with interpersonal relationships, under the law there was no evidence of misconduct and the Office of Professional Medical Conduct closed the case. (Pl.'s Exs. 14 & 15.)

The plaintiff filed this action on November 23, 1998. The plaintiff alleges that the initiation of the disciplinary proceedings against him was in retaliation for his outspoken criticism and complaints with respect to KCHC policy and conditions, and thus violated his First Amendment rights. (Compl.¶¶ 75, 76.) The plaintiff also alleges that the disciplinary proceedings that culminated in the revocation of his privileges and the loss of his job were procedurally flawed, violated the KCHC Medical Staff By-laws and his right to due process under the Fourteenth Amendment. (Compl.¶¶ 55, 72, 76.) In addition to his federal claims under 42 U.S.C. § 1983, the plaintiff also asserts state law claims for malicious prosecution and for a violation of New York State's whistleblower statute, N.Y. Civil Service Law § 75b.

### III.

In order to prevail on a claim under 42 U.S.C. § 1983, a plaintiff must satisfy two elements: "First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) (citing *Monroe v. Pape,* 365 U.S. 167, 171, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)); *see also Finley v. Giacobbe,* 79 F.3d 1285, 1296 (2d Cir.1996); *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). In this case, there is no dispute that the alleged actions by the defendants arose under color of state law. The plaintiff alleges that he was deprived of two constitutional rights, his First Amendment right to free speech and his Fourteenth Amendment right to due process.

### IV.

The defendants argue that they are entitled to summary judgment dismissing the plaintiff's First Amendment claim.

It is well-established that a public employer cannot retaliate against an employee for the exercise of the employee's First Amendment free speech rights. *Rankin v. McPherson,* 483 U.S. 378, 383–84, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1057–58 (2d Cir.1993); *Ezekwo v. NYC Health & Hosps. Corp.,* 940 F.2d 775, 780 (2d Cir.1991). To determine whether an adverse employment decision violates a government employee's right to free speech, the employee must show (1)

---

**2.** HHC appealed the decision of the New York State Supreme Court, New York County to the Appellate Division, First Department. However, that appeal was subsequently withdrawn.

that the speech at issue was constitutionally protected, (2) that he suffered an adverse employment decision, and (3) that there is a causal connection between his speech and the adverse employment .decision such that it can be said that the employee's speech was a motivating factor in the adverse employment decision. *See Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999) (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 286, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)); *see also Gorman–Bakos v. Cornell Cooperative Extension of Schenectady Cty.,* 252 F.3d 545, 553 (2d Cir.2001). If a plaintiff proves these elements, a public employer and its agents may avoid liability by proving by a preponderance of the evidence that they would have made the adverse employment decision even in the absence of the protected conduct. *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568; *Morris,* 196 F.3d at 110.

■ Not all employee speech is entitled to constitutional protection. If the employee's speech relates solely to issues of personal concern to the employee, the speech is not protected. *See Bernheim v. Litt,* 79 F.3d 318, 324–25 (2d Cir.1996); *Saulpaugh v. Monroe Cmty. Hosp.,* 4 F.3d 134, 143 (2d Cir.1993) (speech is not entitled to First Amendment protection if it is personal in nature and relates to the plaintiff's individual situation). As the Supreme Court instructed in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), "when a public employee speaks not as a citizen upon matters of public concern, but instead as a employee upon matters of only personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147, 103

S.Ct. 1684; *see also Bernheim,* 79 F.3d at 324 (quoting *Connick*); *White Plains Towing Corp.,* 991 F.2d at 1058 (same); *Ezekwo,* 940 F.2d at 781. The fact that an employee has a personal interest in certain speech, however, does not necessarily disqualify that speech from First Amendment protection. *See Wise v. New York City Police Dept.,* 928 F.Supp. 355, 372 (S.D.N.Y.1996); *Rodriguez v. Chandler,* 641 F.Supp. 1292, 1299 (S.D.N.Y.1986), *aff'd,* 841 F.2d 1117 (2d Cir.1988); *O'Malley v. New York City Transit Auth.,* 829 F.Supp. 50, 54 (E.D.N.Y.1993).

The question of whether speech is protected by the First Amendment is an issue of law for the Court. *See Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. 1684; *Ezekwo,* 940 F.2d at 781. The First Amendment protects speech by a government employee only if the speech addresses a matter of public concern. *Connick,* 461 U.S. at 140–49, 103 S.Ct. 1684; *Ezekwo,* 940 F.2d at 781 (2d Cir.1991). Speech will be considered to relate to a matter of public concern if it can be "fairly considered as relating to any matter of political, social or other concern to the community." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684; *see also Ezekwo,* 940 F.2d at 781. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684; *see also Ezekwo,* 940 F.2d at 781.

■ The defendants first argue that the plaintiff's alleged criticism and complaints with respect to KCHC policy and conditions did not involve matters of public concern because they were motivated by personal concerns and thus were not protected speech. There is sufficient evidence to establish that the plaintiff made a number of complaints with respect to KCHC policy and conditions that involved

matters of public concern. For example, the plaintiff sent two letters to Sandy Kuehl, Chief Health Advisor to then mayor-elect Rudolph Giuliani, in November 1993, raising perceived problems with the management of KCHC and HHC in general. (Pl.'s Ex. 12 at 10006–13.) The plaintiff also complained to the New York State Department of Health in a letter dated January 8, 1993, about the lack of isolation facilities in the UCC and problems with the ventilation systems in areas where patients with infectious diseases are treated. (Pl.'s Ex. 12 at 100034.) In addition, the plaintiff made complaints to KCHC officials about inadequate facilities at KCHC and its effect on patient management and care. (Pl.'s Ex. 12 at 100076, 100080–81.) These complaints clearly address matters of public concern protected by the First Amendment because they relate to issues of public health, safety, and the administration of public resources.

The defendants next assert that, even if the plaintiff has made complaints addressing matters of public concern, the plaintiff cannot establish a causal connection between his complaints and the initiation of the RDA by Dr. Rice. In particular, the defendants submit an affidavit from Dr. Rice that states he was unaware of any of the plaintiff's complaints. (Defs.' Ex U at ¶¶ 4–5.) They also argue that although Dr. Rice did not initiate the RDA until April 1994, he had already decided in late 1993 or early 1994 to submit an RDA. Thus, the defendants argue that the plaintiff's complaints were not a motivating factor in Dr. Rice's decision to initiate the RDA. In addition, the defendants claim that they would have reached the same decision in the absence of any protected speech.

The causal connection between protected speech and an adverse employment action "must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech." *Morris*, 196 F.3d at 110 (citing *Mount Healthy City*, 429 U.S. at 287, 97 S.Ct. 568). Causation can be established indirectly, through circumstantial evidence, or directly by evidence of a retaliatory animus. *See id.; Ostrowski v. Atlantic Mutual Ins. Cos.*, 968 F.2d 171, 181–182 (2d Cir.1992). The timing of a defendant's conduct, such as where the protected speech was followed closely in time by adverse treatment in employment, may be circumstantial evidence of a retaliatory motive. *See Gorman–Bakos*, 252 F.3d at 554. The Court of Appeals for the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and allegedly retaliatory action." *Id.* (collecting cases); *see also Benedict v. Town of Newburgh*, 125 F.Supp.2d 675, 678–79 (S.D.N.Y.2000). Moreover, in cases where an employer's state of mind or motives are relevant, the materials before the court must be carefully scrutinized for circumstantial evidence that could support an inference of retaliatory animus. *See Rucci v. Thoubboron*, 68 F.Supp.2d 311, 318 (S.D.N.Y.1999) (citing *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir.1996)).

■ In this case, there are genuine issues of material fact as to whether the initiation of the RDA and eventual termination of the plaintiff was causally connected to the plaintiff's complaints and whether the defendants would have reached the same decision in the absence of any protected speech. First, there is a factual

dispute with respect to whether Dr. Rice was aware of the plaintiff's various complaints. Dr. Rice is an addressee on one of the plaintiff's letters complaining of inadequate facilities that was sent prior to the initiation of the RDA in April 1994. (Pl.'s Ex. 12 at 100076.) Dr. Rice was also copied on a response to some of the plaintiff's complaints dated March 21, 1994. (Pl.'s Ex. 12 at 100081.) In addition, the plaintiff alleges that he made numerous complaints directly to Dr. Rice and would raise complaints about the practice of medicine at KCHC during monthly DEM staff meetings, which certain defendants, including Dr. Rice, attended on occasion. (Affirmation of Clifford J. Scheiner dated October 16, 2000 ("October Scheiner Aff."), ¶¶ 1–3.)

Second, the temporal proximity between the plaintiff's complaints, which were made throughout 1993 and through 1994, and the initiation of the RDA in April 1994 support an allegation of a causal connection sufficient to survive summary judgment. *See Gorman–Bakos*, 252 F.3d at 555. For example, the plaintiff submitted a number of complaints asserting matters of public concerns in a request form dated March 2, 1994—one month prior to the initiation of the RDA—to which the plaintiff received a response dated March 21, 1994 that was copied to Dr. Rice. (Pl.'s Ex. 12 at 100081.)

Third, there are genuine issues of material fact with respect to whether the charges against the plaintiff were justified, raising questions as to how important a role the plaintiff's protected speech played in the initiation of the RDA and the decision to terminate the plaintiff. *See Morris*, 196 F.3d at 110. In particular, the plaintiff alleges that there are no documents in existence indicating any deficiency in the plaintiff's clinical care when the RDA was prepared and he points to his quality assurance evaluations, which indi-

cate that, for the most part, the plaintiff was in compliance with the DEM's standards. (Affirmation of Clifford J. Schenier dated September 5, 2000 ("September Schiemer Aff."), at ¶¶ 12–16; Pl.'s Ex. 4.) In addition, the plaintiff has submitted his detailed rebuttals to the charges in the RDA which set forth his rationale for the medical care provided to the sixteen patients whose care was cited in the RDA as evidence of the plaintiff's incompetence. (Pl.'s Exs. 1 & 2.) The plaintiff also submits an affirmation from Dr. Kildare Clarke, a physician employed by KCHC in the DEM who reviewed the sixteen patient charts submitted in the RDA, which supports the plaintiff's position that the plaintiff is a competent physician and that the plaintiff did not deviate from the standard medical practice in the DEM in treating those sixteen patients. (Affirmation of Kildare Clarke dated August 31, 2000 ("Clarke Aff."), at ¶¶ 2–4.) Dr. Clarke also rebuts allegations with respect to the plaintiff's alleged rude behavior. (Clarke Aff. at ¶ 4.) Thus, the plaintiff has pointed to specific evidence indicating that the charges in the RDA were a pretext for retaliatory animus.

Accordingly, drawing all inferences in favor of the plaintiff, there are genuine issues of material fact with respect to the plaintiff's First Amendment claim. Summary judgment dismissing that claim is therefore denied.

## V.

The defendants next argue that they are entitled to summary judgment dismissing the plaintiff's due process claim.

## A.

■ The defendants first assert that, in requesting arbitration, the plaintiff waived his right to submit his Section 1983 due process claim to a judicial forum. The

defendants rely on a provision of the applicable Doctor's Council collective bargaining agreement that requires, as a condition to arbitration of a grievance, that the employee file a written waiver of the right "to submit the underlying dispute to any other administrative or judicial tribunal except for the purpose of enforcing the arbitration award." (Defs.' Ex. V. at Article VIII, § 3.) The plaintiff signed such a written waiver, which states that the plaintiff agreed to "waive [his] rights to submit the underlying dispute to any other administrative or judicial tribunal except for the purpose of enforcing the arbitrator's award." (Defs.' Ex. S.) The grievance submitted to arbitration was for the "[v]iolation of the applicable Doctors Council collective bargaining agreement by the improper discipline and/or termination of employment of Clifford Scheiner, M.D.." (Defs.' Ex. S.) The defendants argue that this language constitutes a clear and unmistakable waiver of the plaintiff's federal statutory rights.

The defendants' argument cannot be sustained. The plaintiff in this case is suing for the violation of his federal statutory rights and not for violations of the collective bargaining agreement. Provisions in a union negotiated collective bargaining agreement for an arbitration process for grievances do not preclude the availability of remedies for violations of federal statutory rights such as Section 1983. *See Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 52–54, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (holding that an adverse arbitration decision provided for in a collective bargaining agreement did not preclude a discharged employee from suing under Title VII); *see also McDonald v. City of West Branch,* 466 U.S. 284, 289–90, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984) (finding that adverse arbitration decision did not preclude the discharged employee from suing under Section 1983); *Barren-*

*tine v. Arkansas–Best Freight System,* 450 U.S. 728, 745–46, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (reaching same result concerning claim under the Fair Labor Standards Act); *Rogers v. New York University,* 220 F.3d 73, 75 (2d Cir.) (adhering to *Gardner–Denver* in finding that arbitration provision in a union-negotiated collective bargaining agreement which purported to waive an employee's right to federal forum with respect to statutory claims is not enforceable), *cert. denied,* 531 U.S. 1036, 121 S.Ct. 626, 148 L.Ed.2d 535 (2000); *Wilmington v. J.I. Case Co.,* 793 F.2d 909, 918 (8th Cir.1986) (holding that claims under Section 1981 are independent from any rights an employee has under the terms of a collective bargain agreement and that arbitral awards do not foreclose exercise of Section 1981 rights). Although the Supreme Court's recent decision in *Wright v. Universal Maritime Service Corp.,* 525 U.S. 70, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998), suggests that a union-negotiated waiver of an employee's federal statutory right to judicial forum might be enforceable, it declined to decide the issue. *Wright,* 525 U.S. at 75–77, 82, 119 S.Ct. 391. The Court of Appeals for the Second Circuit, however, has expressly held that a union negotiated collective bargaining agreement's mandatory arbitration provision cannot bar union members from bringing federal claims to court. *See Rogers,* 220 F.3d at 75.

Under *Wright,* even if a waiver was enforceable, such a waiver in a collective bargaining agreement must at a minimum be clear and unmistakable. *Wright,* 525 U.S. at 80, 119 S.Ct. 391. There are two factors that a court can examine to determine whether a waiver is "clear and unmistakable." *Rogers,* 220 F.3d at 76. "First, a waiver is sufficiently explicit if the arbitration clause contains a provision whereby employees specifically agree to

submit all federal causes of action arising out of their employment to arbitration." *Id.* "Second, a waiver may be sufficiently clear and unmistakable when the [collective bargaining agreement] contains an explicit incorporation of the statutory antidiscrimination requirements in addition to a broad and general arbitration clause." *Id.*

In this case, the applicable Doctor's Council collective bargaining agreement requires, as a condition to arbitration of a grievance, that the employee file a written waiver of the right "to submit the underlying dispute to any other administrative or judicial tribunal except for the purpose of enforcing the arbitration award." (Defs.' Ex. V at Article VIII, § 3.) This provision is a not a "clear and unmistakable" waiver of the rights of represented employees to pursue their rights to sue for violations of Section 1983 in federal court. This clause is very general and could reasonably be read to apply to disputes concerning violations of the collective bargaining agreement, rather than violations of a federal statute. Moreover, there is no evidence that the collective bargaining agreement explicitly incorporates any statutory antidiscrimination requirements. (Defs.' Ex. V.)

The collective bargaining agreement required the employee to file a written waiver so that any waiver in this case was affected not only by the union negotiated collective bargaining agreement but also by the waiver that was actually signed by Scheiner when he submitted his grievance to arbitration. The defendants point out that in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the Supreme Court held that a claim under the Age Discrimination in Employment Act of 1967("ADEA"), 29 U.S.C. § 621 *et. seq.*, could be subject to compulsory arbitration pursuant to an arbitration provision in a securities registration form signed by the employee. However, the waiver signed by the plaintiff here and the rationale of the *Gilmer* case are of no help to the defendants because the waiver that was signed by the plaintiff here, unlike the waiver in *Gilmer*, is not broad enough to cover the federal claims the plaintiff seeks to assert in this action. The waiver signed by the plaintiff waived his "rights to submit the underlying dispute to any other administrative or judicial tribunal except for the purpose of enforcing the arbitrator's award." (Defs.' Ex. S.) The grievance specified in the waiver that was submitted to arbitration was: "Violation of the applicable ... collective bargaining agreement by the improper discipline and/or termination of employment of Clifford Scheiner, M.D." (Defs.' Ex. D.) Thus, the only dispute that the plaintiff agreed to submit to arbitration and for which he waived his right to seek judicial review is the dispute over a violation of the collective bargaining agreement, not a dispute over violations of a federal statute such as Section 1983.

Thus, neither the collective bargaining agreement nor the waiver that the plaintiff signed precluded the plaintiff from pursuing his claims under Section 1983.

**B.**

The defendants next assert that they are entitled to summary judgment on the plaintiff's due process claim because the plaintiff received all the process that he was due.

To state a procedural due process claim a plaintiff must establish that: (1) he has been deprived of life, liberty, or property; and (2) without due process of law. *Cf. Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (describing the "familiar two-part inquiry" in which a court "must determine

whether [the plaintiff] was deprived of a protected interested, and, if so, what process was his due"); *Narumanchi v. Board of Trustees*, 850 F.2d 70, 72 (2d Cir.1988).[3] "An essential principle of due processes that deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). Thus, "some kind of hearing" is required, but the nature of the hearing may vary "depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Loudermill*, 470 U.S. at 542, 545, 105 S.Ct. 1487 (quotations omitted).

The defendants assert that the plaintiff had adequate notice of the charges against him and had an opportunity to be heard at multiple levels provided in the KCHC Medical Staff By-laws—the AHC, the MSC, the IHP, the AB, and the appeal to the President of HCC. The plaintiffs rely on, among other things, Dr. Low's April 27, 1994 letter, the fact that the plaintiff was provided an opportunity to review the patient medical charts prior to meeting with the AHC, and the plaintiff's receipt of the RDA prior to the IHP hearing for the proposition that the plaintiff received adequate notice of the charges against him and sufficient explanation of the evidence against him.

To satisfy due process, however, "facially adequate procedures must be realized in practice." *Scheiner*, 1999 WL 771383, at *7. To fulfill the requirements imposed by the Due Process Clause, the notice and opportunity to be heard must occur "at a

meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (internal quotation and citation omitted); *see also Burtnieks v. City of New York*, 716 F.2d 982, 986 (2d Cir.1983). Thus a person must receive notice of the charges against him, an explanation of the evidence against him and an opportunity to present his side of the story. *See Loudermill*, 470 U.S. at 546, 105 S.Ct. 1487; *Greenwood v. New York*, No. 84 Civ. 9143, 2000 WL 1336281, at *5 (S.D.N.Y. Sept. 14, 2000); *Scheiner*, 1999 WL 771383, at *7 ("The person whose interests are in jeopardy must have adequate opportunity to respond to the charges made against him, including adequate notice of the charges and a chance to inspect the evidence to be introduced."). A hearing is not "meaningful" where a person is given inadequate information regarding the basis of the charges against him. *See Taylor v. Rodriguez*, 238 F.3d 188, 192 (2d Cir.2001) (discussing required notice for administrative segregation of a prisoner). "Minimum requirements [of due process] ... include a notice that is something more than a mere formality" and notice should be sufficiently specific as to the misconduct alleged. *Taylor*, 238 F.3d at 192; *see also Galvin v. New York Racing Association*, 70 F.Supp.2d 163, 176 (E.D.N.Y.), *aff'd*, 166 F.3d 1200 (2d Cir.2000).

■ From the record before the Court, it appears that a reasonable trier of fact could conclude that the defendants' violated the plaintiff's due process rights. Here, the plaintiff contends that he was, in effect, denied an opportunity to respond to the charges against him. In particular, the plaintiff claims that he was disciplined on charges of which he did not receive

---

**3.** In deciding the previous motion to dismiss in this action, the Court found that the plaintiff has alleged the deprivation of both a liberty and property interest. *See Scheiner*, 1999 WL 771383, at *6.

adequate notice, and which were unreliable because they were based on hearsay. The plaintiff points to testimony from Dr. Rice before the IHP relating to alleged complaints about the plaintiff of rudeness and instances of incompetence other than those complaints and instances of incompetence alleged in the RDA, often from unspecified or hearsay sources. (Joint Ex. 21, Jan. Tr. at 10–11, 12–13, 26–29, 70–71, 114–15, 222–228, 237–38.) Similarly, the AB also was presented with statements from Dr. Rice that there had been complaints about the plaintiff and counseling sessions not discussed in the RDA, although Dr. Rice did not provide specifics about many of the alleged complaints. (Joint Ex. 27, Transcript dated June 13, 1995 ("June Tr."), at 28–32.) Viewing the evidence in the light most favorable to the plaintiff, there are issues of fact with respect to whether this testimony constitutes charges different from the original charges contained in the RDA and whether the plaintiff had sufficient notice of these additional charges and the evidence on which the charges were based.

In addition, there are issues of fact with respect to whether the IHP relied on charges of which the plaintiff did not have sufficient notice. As a result of the IHP hearing, the IHP submitted a brief two-page report to the chairperson of the Grievance Committee supporting revocation of the plaintiff's clinical and staff privileges and the plaintiff's termination and a letter was sent to the plaintiff stating that the findings of the MSC that the plaintiff's clinical privileges and staff membership be revoked and the plaintiff be terminated were appropriate. (Joint Exs. 22 & 23.) Although the report summarized seven findings, which could generally be termed medical incompetence, the report did not discuss what evidence the IHP relied on in reaching its findings. (Joint Ex. 22.) Because it is not clear from the report and the current record before the Court whether the IHP findings were based on the original charges and the sixteen patient cases contained in the RDA or whether they are in fact based on additional conduct raised for the first time before the IHP and the degree to which that conduct is unsupported and based on possibly unreliable hearsay, summary judgment is inappropriate.[4]

In sum, the plaintiff has come forward with sufficient evidence to create genuine issues of material fact as to whether the plaintiff was afforded adequate notice and a meaningful opportunity to be heard prior to the revocation of his clinical privileges and his termination. Thus, the defendants' motion for summary judgment on the plaintiff's due process claims is denied.[5]

## VI.

■ The defendants also contend that they are entitled to summary judgment on the plaintiff's Section 1983 claims under the doctrine of qualified immunity. Under the doctrine of qualified immunity, "gov-

---

**4.** The defendants argue that any flaws in the pre-deprivation hearing were cured by the availability of the post-deprivation arbitration process. The Court already rejected this argument in the prior opinion on the motion to dismiss. *See Scheiner*, 1999 WL 771383, at *7–9.

**5.** In addition, the Court has already determined that there are issues of fact with respect to whether the defendants, including those directly involved in the review of the plaintiff's disciplinary proceedings, terminated the plaintiff because he engaged in protected speech. If there are issues of fact as to whether the plaintiff was terminated in violation of his First Amendment rights, there is reason to believe that the plaintiff did not receive a "meaningful" opportunity to be heard from those directly involved in his termination.

ernment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right. The unlawfulness must be apparent." *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal quotation marks, ellipses, and brackets omitted)); *see also Saucier v. Katz,* 531 U.S. 991, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001); *Durven D. v. Giuliani,* No. 98 Civ. 0523, 2000 WL 1145425, at *8 (S.D.N.Y. Aug. 11, 2000). There is no doubt that the plaintiff's rights under both the First Amendment and the Fourteenth Amendment were clearly established at the time the plaintiff was disciplined. *See Scheiner,* 1999 WL 771383, at *11–12.

Nevertheless, "even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon v. Miller,* 66 F.3d 416, 420 (2d. Cir.1995) (citations omitted); *Frank v. Relin,* 1 F.3d 1317, 1328 (2d Cir.1993). The Court of Appeals has held that on a summary judgment motion, a defendant is entitled to summary judgment on these grounds when "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ] to believe that he was acting in a fashion that did not

clearly violate an established federally protected right." *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997) (internal citations omitted); *Lennon,* 66 F.3d at 420. Thus "if any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment." *Lennon,* 66 F.3d at 420.

There are factual issues as to whether the defendants violated the plaintiff's rights under the First Amendment and under the Fourteenth Amendment. There are issues of fact with respect to, among other matters, whether the defendants retaliated against the plaintiff because he expressed his views on matters of public interest, whether the reasons that were given for his discharge were in fact pretextual, and whether the decisions of the various decision-makers were based on charges of which the plaintiff had not been provided with notice and a meaningful opportunity to respond. Given the state of the current factual record in this case, and construing the evidence in the light most favorable to the plaintiff, a reasonable trier of fact could find that the defendants' actions were objectively unreasonable and that the defendants are not entitled to the protection of the qualified immunity defense. Thus, the defendants' motion for summary judgment on this ground is denied.

## VII.

The defendants next move to dismiss the plaintiff's state law claims for violations of New York State's whistleblower statute, N.Y. Civ. Serv. Law § 75–b, and for malicious prosecution.

### A.

■ N.Y. Civ. Serv. Law § 75–b(2)(a) prohibits a "public employer" from taking adverse personnel action against an employee who discloses information to a governmental body:

(i) regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action. "Improper governmental action" shall mean any action by a public employer or employee, or an agent of such employer or employee, which is undertaken in the performance of such agent's official duties, whether or not such action is within the scope of his employment, and which is in violation of any federal, state or local law, rule or regulation.

N.Y. Civ. Serv. Law § 75–b(2)(a).

The defendants assert that the plaintiff's claim under N.Y. Civ. Serv. Law § 75–b should be dismissed for the same reasons that they argued the plaintiff's First Amendment claim should be dismissed. The Court, however, has already found that there are genuine issues of material fact with respect to the plaintiff's First Amendment claim. In addition, there is evidence that the plaintiff made complaints and disclosed information to the N.Y. State Department of Health concerning alleged improper governmental action. (Pl.'s Ex. 12 at 100034.) Thus, there are also genuine issues of material fact with respect to whether the defendants took adverse personnel action against the plaintiff for disclosing information to a governmental body.[6]

## B.

■ To prevail on a claim of malicious prosecution under New York law, a plaintiff must show: (1) the institution of an action or proceeding by the defendant; (2) begun with malice; (3) the absence of probable cause to support the proceeding; and (4) termination of the proceeding in favor of the plaintiff. *See Engel v. CBS, Inc.,* 145 F.3d 499, 502 (2d Cir.1998); *Butler v. Ratner,* 210 A.D.2d 691, 619 N.Y.S.2d 871, 873 (1994), *leave to appeal dismissed,* 85 N.Y.2d 924, 627 N.Y.S.2d 325, 650 N.E.2d 1327 (1995). In addition, where the proceeding of which the plaintiff complains was a civil action or proceeding, the plaintiff must prove special damages involving injury to or interference with personal or property rights beyond the ordinary burden of defending a lawsuit. *Engel,* 145 F.3d at 502; *Campion Funeral Home, Inc. v. State,* 166 A.D.2d 32, 569 N.Y.S.2d 518, 521, *appeal denied,* 78 N.Y.2d 859, 575 N.Y.S.2d 455, 580 N.E.2d 1058 (1991).

■ New York courts have held that administrative proceedings may form the basis for malicious prosecution actions where the administrative proceedings "have sufficient attributes of judicial proceedings," such as where there is a "hearing and trial on the issues on evidence and testimony under oath, with the right of cross-examination." *Groat v. Town Bd. of Town of Glenville,* 73 A.D.2d 426, 426 N.Y.S.2d 339, *appeal dismissed,* 50 N.Y.2d 928 (1980); *see also Dillon v. Boyce,* 94 Civ. 1363, 1995 WL 116476, at *6 (E.D.N.Y. Mar. 8, 1995); *Glenn v. State,* 144 Misc.2d 101, 543 N.Y.S.2d 632, 634 (Ct.Cl.1989); *Treacy v. State,* 131 Misc.2d 849, 501 N.Y.S.2d 1005, 1006 (1986), *aff'd,* 125 A.D.2d 916, 510 N.Y.S.2d 280 (1996),

6. There is authority for the proposition that, while N.Y. Civ. Serv. Law § 75–b provides a cause of action against government entities, such as HHC, it does not provide a cause of action against individual employees. *See Fry v. McCall,* 945 F.Supp. 655, 666 (S.D.N.Y. 1996) (collecting cases). However, the individual defendants have not moved to dismiss this claim against them on this basis.

*aff'd,* 72 N.Y.2d 212, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (1988).

In this case, the plaintiff relies on both his disciplinary proceedings under the KCHC Medical Staff By-laws and the investigation by the Office of Professional Medical Conduct ("OPMC") as "proceedings" for the first element of his malicious prosecution claim. The defendants did not question this specific element in moving to dismiss the plaintiff's malicious prosecution claim. While the parties have addressed this issue in subsequent submissions, because this was not a ground for summary judgment, the Court declines to decide whether either of these proceedings is sufficient under state law to constitute a proceeding. In particular, the parties have failed to develop what, if any, proceedings are conducted by the OPMC and whether they are sufficiently judicial to qualify as a proceeding under New York State law. Thus, the Court cannot decide the issue on the current state of the record and the issue may be raised in a motion in limine before trial. While the defendants did argue that no proceeding was terminated in favor of the plaintiff, it is plain that at least the OPMC proceeding terminated in favor of the plaintiff because the OPMC found that there was no evidence of misconduct by the plaintiff and closed the case. In addition, while the defendants argue to the contrary, there are issues of fact as to whether either proceeding was begun with malice on the part of the defendants and whether the defendants had probable cause to support the proceeding.[7]

■■■ The defendants also contend that they are entitled to absolute immunity for the state law claims because their actions were official actions involving the exercise of discretion. Whether an action of a governmental employee or official is "cloaked with any governmental immunity requires an analysis of the functions and duties of the actor's particular position and whether they inherently entail the exercise of some discretion and judgment." *Mon v. City of New York,* 78 N.Y.2d 309, 574 N.Y.S.2d 529, 579 N.E.2d 689, 691 (1991) (citing *Arteaga v. State,* 72 N.Y.2d 212, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (1988); *Tarter v. State,* 68 N.Y.2d 511, 510 N.Y.S.2d 528, 503 N.E.2d 84 (1986)). Generally, if the functions and duties at issue are essentially "clerical or routine, no immunity will attach." *Mon,* 574 N.Y.S.2d 529, 579 N.E.2d at 691. When "official action involves the exercise of discretion or expert judgment in policy matters, and is not exclusively ministerial, a municipal defendant is generally not answerable in damages for the injurious consequences of that action." *Id.* at 692 (citing *Haddock v. City of New York,* 75 N.Y.2d 478, 554 N.Y.S.2d 439, 553 N.E.2d 987, 988 (1990)); *see also Tango v. Tulevech,* 61 N.Y.2d 34, 471 N.Y.S.2d 73, 459 N.E.2d 182, 185–86 (1983). This general rule reflects "a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability from that injury." *Id.* (citing *Haddock,* 554 N.Y.S.2d 439, 553 N.E.2d at 987.)

---

**7.** The plaintiff has not attempted to distinguish among the defendants in bringing his claims for malicious prosecution. The defendants, in bringing their motion for summary judgment, have similarly not sought to distinguish among the defendants. It is plain that at least with respect to Dr. Rice, who signed the RDA and instituted the disciplinary proceeding and brought the charges to the attention of the OPMC, it cannot be said that there are no issues of fact as to the existence of actual malice and probable cause. The thrust of the plaintiff's evidence as discussed above shows that such issues exist.

However, not all discretionary actions are afforded absolute immunity. *Arteaga*, 532 N.Y.S.2d 57, 527 N.E.2d at 1196. Whether an action receives absolute immunity or only qualified immunity requires an analysis of the functions and the duties of the particular governmental officer or employee whose conduct is at issue. *Id.* The analysis focuses on the scope of the "delegated discretion and whether the position entails making decisions of a judicial nature—i.e., decisions requiring the application of governing rules to particular facts, and exercise of reasoned judgment which could typically produce different acceptable results." *Id.* (citing *Tango*, 471 N.Y.S.2d 73, 459 N.E.2d at 186). Governmental actions involving an investigatory rather than a prosecutorial function have been found to warrant qualified rather than absolute immunity. *See Best v. State*, 264 A.D.2d 404, 694 N.Y.S.2d 689, 690 (1999). "If a functional analysis of the actor's position shows that it is sufficiently discretionary in nature to warrant immunity, it must then be determined whether the conduct giving rise to the claim is related to an exercise of that discretion." *Mon*, 574 N.Y.S.2d 529, 579 N.E.2d at 692.

In this case, the Court cannot decide the issue of whether absolute immunity applies to the defendants on the current state of the record. The defendants have not attempted to distinguish among the various defendants and their different functions and duties in the disciplinary proceedings brought against the plaintiff nor have they addressed whether the various defendants' positions entail investigatory functions or making decisions of a judicial nature.

Accordingly, the defendants' motion for summary judgment dismissing the plaintiff's state law claims is denied.

## VIII.

The plaintiff seeks partial summary judgment against the Responding Defendants based solely on the plaintiff's due process claim as it relates to the proceedings beginning with the IHP. The plaintiff argues that it can be decided as a matter of law that he did not receive fair notice of the subject matter of the disciplinary proceedings before the IHP and AB and that the plaintiff was not given a fair opportunity to be heard.

However, as discussed above, there are issues of fact as to what evidence the IHP actually relied upon in reaching its recommendation and whether the plaintiff had notice of what the IHP relied upon. Moreover, viewing the evidence and the light most favorable to the defendants, there are issues of fact as to whether the plaintiff was provided an adequate opportunity to respond to the charges made against him. Although his questioning was limited both before the IHP and the AB, the plaintiff submitted to the IHP a detailed rebuttal to the charges contained in the RDA prior to the IHP hearing. (Pl.'s Ex. 1.) In addition, after the IHP hearing in January 1995, and before its decision, the plaintiff submitted another rebuttal that addressed allegations raised at the IHP hearing that were not discussed in the RDA. (Pl.'s Ex. 2.) Thus, summary judgment is inappropriate, and the plaintiff's motion is denied.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 is denied. The plaintiff's motion for partial summary judgment pursuant to Fed.R.Civ.P. 56 is also denied.

**SO ORDERED.**